IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
         )
RUTH LENTZ, Individually and On Behalf of  )
All Others Similarly Situated,,        )
         )
        Plaintiff,     )
         )
        – vs.–      )
         )
CITADEL SECURITY SOFTWARE, INC., et  )
al.         )
         )
        Defendants.   )
         )
         )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CIVIL ACTION NO. 3:05-CV-0100-D
(Consolidated with
Civil Action No. 3:05-CV-0142-D
Civil Action No. 3:05-CV-0157-D
Civil Action No. 3:05-CV-0184-D
Civil Action No. 3:05-CV-0203-D
Civil Action No. 3:05-CV-2097-D
and
Civil Action No. 3:05-CV-0488-D)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
         )
HANS J. BAIER, derivatively on behalf of  )
Nominal Defendant, CITADEL SECURITY  )
SOFTWARE, INC.,       )
         )
        Plaintiff,     )
         )
        – vs.–      )
         )
STEVEN B. SOLOMON, RICHARD  )
CONNELLY, CHRIS A. ECONOMOU  )
         )
        Defendants,   )
         )
And         )
         )
CITADEL SECURITY SOFTWARE, INC.  )
         )
       Nominal Defendant  )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 3:05-CV-0846-D

**LEAD PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR FINAL APPROVAL
OF PROPOSED SETTLEMENT AND PLAN OF ALLOCATION**

Randall K. Pulliam
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Tx 75219-4281
Tel: (214) 521-3605
Fax: (214) 520 1181

Marvin L. Frank
MURRAY, FRANK & SAILER LLP
275 Madison Ave, Suite 801
New York, New York 10016
(212) 682-1818
(212) 682-1892

Joseph Sternberg
Beth Hoffman
LABATON SUCHAROW
  & RUDOFF LLP
100 Park Avenue, 12th Floor
New York, New York 10017
Tel.: (212) 907-0700
Fax: (212) 818-0477

William B. Federman
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, Oklahoma  73120
Tel.: (405) 235-1560
Fax: (405) 239-2112

**ATTORNEYS FOR PLAINTIFFS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 2

    The Class Action Settlement ................................................................. 3

    The Derivative Action Settlement ........................................................ 4

DESCRIPTION OF THE ACTION AND SETTLEMENT ........................ 5

    History of the Litigation and Summary of Claims ................................ 5

    Settlement Discussions ......................................................................... 7

    Benefits Of The Proposed Settlement ................................................... 8

    The Court's Order Preliminarily Approving the Settlement and the
        Comprehensive Pre-Hearing Notice Program ....................... 9

ARGUMENT .......................................................................................... 10

    I.     THE COURT SHOULD GRANT FINAL APPROVAL OF THE
            SETTLEMENT ............................................................................ 10

         A.  Applicable Standards .......................................................... 10

         B.  The Settlement Is Fair, Adequate and Reasonable   Under
              Factors Articulated By the Fifth Circuit ............................. 13

             1.     The Settlement Is the Product of Extensive Arm's-
                    Length Negotiations Among Sophisticated Parties
                    and   Experienced Counsel, and There Is No Trace
                    of  Fraud   or Collusion .............................................. 13

             2.     Continued Litigation Would Be Extremely
                    Complex, Costly, and Lengthy ................................... 15

             3.     The Stage Of The Proceedings And The Amount
                    Of Available Discovery .............................................. 17

             4.     Lead Plaintiff Faced Substantial Factual    and
                    Legal Obstacles to Prevailing on the Merits ............. 19

                  (a)     The $1.75 Million Settlement Amount Is an
                         Excellent Recovery in Light of the Range of
                           Potential Recovery at Trial ............................ 22

             5.     Lead Plaintiff, Absent Class Members, and Lead
                      Counsel Strongly Support the Settlement ................... 24

    II.    THE PLAN OF ALLOCATION OF THE NET SETTLEMENT
            FUND IS  FAIR, ADEQUATE AND REASONABLE AND
             SHOULD BE APPROVED .......................................................... 25

    III.    THE CLASS SHOULD BE CERTIFIED UNDER RULE 23 ............. 26

A.  Numerosity .................................................................................................. 26

B.  Commonality ............................................................................................... 27

C.  Typicality .................................................................................................... 28

D.  Adequacy of Representation ........................................................................ 29

E.  The Action Satisfies the Requirements of Rule 23(b)(3) .............................. 29

    1.  Common Questions of Law and Fact Predominate ......................... 30

    2.  A Class Action is the Superior Method  of
       Adjudicating this Controversy ...................................................... 32

IV.  THE SETTLEMENT OF THE DERIVATIVE ACTION SHOULD
    BE  APPROVED BY THE COURT ................................................................. 34

CONCLUSION ................................................................................................................ 37

## TABLE OF AUTHORITIES

**Statutes and Rules**

Fed. R. Civ. P. 23 ................................................................................................ passim

Fed. R. Civ. P. 23(e) ................................................................................................ 1, 12

Fed. R. Civ. P. 23.1 ...................................................................................................... 1

Securities Exchange Act of 1934, Rule l0b-5 ............................................................. 3

Securities Exchange Act of 1934, Section 10(b) .............................................. passim

Securities Exchange Act of 1934, Section 20(a) ............................................. 3, 5, 15


**Cases**

*Alvarado Partners, L.P. v. Mehta,*
   723 F. Supp. 540 (D. Colo. 1989) ........................................................................ 21

*Amchem Prods. v. Windsor,*
   521 U.S. 591 (1997) ................................................................................ 26, 30, 33

*Backman v. Polaroid Corp.,*
   910 F.2d 10 (1st Cir. 1990) .................................................................................. 17

*Barrie v. Intervoice-Brite,*
   No. 3-01-CV-1071-K, 2006 WL 2792199 (N.D. Tex. Sept. 26, 2006) ............................ 31, 32

*Bell v. Ascendant Solutions, Inc.,*
   422 F.3d 307 (5th Cir. 2005) ................................................................................ 31

*Berger v. Compaq Computer Corp.,*
   257 F.3d 475 (5th Cir. 2001), *clarified on reh'g en banc*, 279 F.3d 313 (5th Cir. 2002) ........ 29

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
   603 F.2d 263 (2d Cir. 1979) ................................................................................ 17

*Bertulli v. Indep. Ass'n of Cont'l Pilots,*
   242 F. 3d 290 (5th Cir. 2001) .............................................................................. 27

*Cammer v. Bloom,*
   711 F. Supp. 1264 (D.N.J.1989) .......................................................................... 32

*Carpe v. Aquila, Inc.*,
   Case No. 02-0388, 2005 WL 1138833 (W.D. Mo. March 23, 2005) ...................................... 15

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268 (9th Cir. 1992).............................................................................................. 25

*Cohn   v. Nelson*,
   375 F. Supp. 2d 844 (E.D. Miss. 2005) ............................................................................ 34, 36

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977)....................................................................................... passim

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ............................................................................................................ 15

*De La Fuente v. Stokely-Van Camp, Inc.*,
   713 F.2d 225 (7th Cir. 1983)................................................................................................ 28

*Faircloth v. Certified Finance Inc.*,
   Case No. 99-3097, 2001 WL 527489 (E.D. La. May 16, 2001) ...................................... passim

*Feinberg v. Hibernia Corp.*,
   966 F. Supp. 442 (E.D. La. 1997) ........................................................................................ 16

*Florida Trailer & Equip. Co. v. Deal*,
   284 F.2d 567 (5th Cir. 1960)................................................................................................ 19

*Greenwald v. Integrated Energy, Inc.*,
   102 F.R.D. 65 (S.D. Tex. 1984)........................................................................................... 33

*Henry v. Cash Today, Inc.*,
   199 F.R.D. 566 (S.D. Tex. 2000) .................................................................................. passim

*In re Catfish Antitrust Litig.*,
   939 F. Supp. 493 (N.D. Miss. 1996) .................................................................................... 23

*In re Chicken Antitrust Litig.*,
   669 F.2d 228 (5th Cir. 1982)................................................................................................ 25

*In re Corrugated Container Antitrust Litig.*,
   643 F.2d 195 (5th Cir. 1981)...................................................................................... 11, 12, 17

*In re Ikon Office Solutions Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000) ..................................................................................... 22, 31

*In re Lease Oil Antitrust Litig. No. II,*
    186 F.R.D. 403 (S.D. Tex 1999) ................................................................... passim

*In re Prudential Ins. Co. of Am.  Sales Practice Litig. Agent Actions,*
    148 F.3d 283 (3d Cir. 1998) ................................................................................ 33

*In re Train Derailment Near Amite Louisiana,*
    Case No. Civ. A. MDL 1531, 2006 WL 1561470 (E.D. La. May 24, 2006) ........................... 24

*In re Union Carbide Corp. Consumer Products Bus. Sec. Litig.,*
    718 F. Supp. 1099 (S.D.N.Y. 1989) ................................................................... 22

*In re Vitek, Inc.,*
    51 F.3d 530 (5th Cir. 1995) ............................................................................. 21

*In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.,*
    364 F. Supp. 2d 980 (D. Minn. 2005) ................................................................ 36

*Jackson v. Capital Bank & Trust Co.,*
    Case Nos. 90-4734, 90-4735, 1994 WL 118322 (E.D. La. March 30, 1994) ........................ 35

*James v. City of Dallas,*
    254 F.3d 551 (5th Cir. 2001) ........................................................................... 28

*Kaufman v. Motorola, Inc.,*
    No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627 (N.D. Ill. Sept. 19, 2000) .......................... 16

*Lewis v. Newman,*
    59 F.R.D. 525 (S.D.N.Y. 1973) ........................................................................ 15

*Lightbourn v. County of El Paso,*
    118 F.3d 421 (5th Cir. 1997) ........................................................................... 27

*Longden v. Sunderman,*
    123 F.R.D. 547 (N.D. Tex. 1998) ...................................................................... 31

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.,*
    671 F. Supp. 819 (D. Mass. 1987) .................................................................... 13

*Maher v. Zapata Corp.,*
    714 F.2d 436 (5th Cir. 1983) .............................................................. 34, 35, 36

*MCI Communications Corp. v. American Tel. & Tel. Co.,*
    `708 F.2d 1081 (7th Cir. 1983) ........................................................................ 17

*Mullen v. Treasure Chest Casino, L.L.C.*,
 186 F.3d 620 (5th Cir. 1999) ............................................................ 27, 28, 30

*Nathenson v. Zonagen Inc.*,
 267 F.3d 400 (5th Cir. 2001) ............................................................ 15

*Neff v. VIA Metropolitan Transit Auth.*,
 179 F.R.D. 185 (W.D. Tex. 1998) .................................................... 12, 29

*Newby v. Enron Corp.*,
 394 F.3d 296 (5th Cir. 2004) ............................................................ 11, 13, 17

*Parker v. Anderson*,
 667 F.2d 1204 (5th Cir. 1982),
 *cert. denied*, 459 U.S. 828 (1982) ................................................... 11, 19, 22

*Pettway v. American Cast Iron Pipe Co.*,
 576 F.2d 1157 (5th Cir. 1978) .......................................................... 11

*Piper v. Chis-Craft Indus., Inc.*,
 430 U.S. 1 (1977) ............................................................................. 17

*Reed v. General Motors Corp.*,
 703 F.2d 170 (5th Cir. 1983) ............................................................ 11, 12, 14

*San Antonio Hispanic Police Officers' Org. v. City of San Antonio*,
 188 F.R.D. 433 (W.D. Tex. 1999) .................................................... 19

*Schwartz v. TXU Corp.*,
 Case No. 02-CV-2243, 2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) ............................ passim

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
 91 F. Supp. 2d 942 (E.D. Tex. 2000) ............................................... 28, 29, 33

*State of Alabama v. Blue Bird Body Co.*,
 573 F.2d 309 (5th Cir. 1978) ............................................................ 33

*Stewart v. Winter*,
 669 F.2d 328 (5th Cir. 1982) ............................................................ 27

*Stirman v. Exxon Corp.*,
 280 F.3d 554 (5th Cir. 2002) ............................................................ 28

*Unger v. Amedisys Inc.*,
 401 F.3d 316, 323 (5th Cir. 2005) .................................................... 32

*Zeidman v. J. Ray McDermott & Co.*,
    651 F.2d 1030 (5th Cir. 1981)................................................................................. 27

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff[1] in the class action *Ruth Lentz v. Citadel Security Software, Inc*., *et al.*, Case No. 3-05-CV-0100-D (the "Class Action" and Lead Plaintiff's counsel is "Class Counsel") respectfully submit this memorandum in support of (i) final approval of the proposed settlement set forth in the Stipulation of Settlement filed with this Court (the "Stipulation"), as it pertains to the Class Action (the "Class Settlement")[2]; (ii) final approval of the plan of allocation of the settlement proceeds, in the amount of $1,750,000, plus interest, to members of the Settlement Class (the "Plan of Allocation"); and (iii) certification of the Settlement Class.[3] Similarly, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, plaintiff in the shareholder derivative action *Hans J. Baier v. Steven B. Solomon, et al*., Case No. 3:05-CV-0846-D (the "Derivative Action" and plaintiff's counsel is "Derivative Counsel")[4] respectfully submits this memorandum in support of final approval of the proposed settlement set forth in the Stipulation as it pertains to the Derivative Action (the "Derivative Settlement"; the Class and Derivative Settlements are collectively the "Global Settlement").

---

[1] The term "Lead Plaintiff," as used herein, refers to Court-appointed Lead Plaintiff Citadel Investors Group (consisting of Elaine Tursoe, Lee Waters, and Howard Dayton).

[2] Lead Plaintiff filed the Stipulation, along with a Motion for Preliminary Approval of the Settlement with the Court on September 19, 2006.

[3] Lead Plaintiff and the Derivative Plaintiff are filing concurrently herewith (1) Declaration of Lawrence D. McCabe in Support of Final Approval of the Settlement And Request For Attorneys' Fees And Reimbursement of Expenses ("McCabe Declaration"); (2) Affidavit of Paul Mulholland, CPA, CVA Concerning Mailing of Notice of Proposed Settlement of Class Action and Derivative Action, Motion for Attorneys' Fees, and Fairness Hearings and Proof of Claim And Release Form ("Claims Administrator Affidavit"); and (3) Plaintiffs' Counsel's Memorandum of Law in Support of Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Attorneys' Fees Memorandum").

[4] Class Counsel and Derivative Counsel are referred to collectively as "Plaintiffs' Counsel."

## PRELIMINARY STATEMENT

The Global Settlement is the product of hard-fought litigation and takes into account the specific risks of the case.  It was negotiated by experienced counsel for each side with a firm understanding of both the strengths and weaknesses of their respective claims and defenses.  The Settlement negotiations were extremely protracted, and a resolution was achieved only through the diligent efforts of Plaintiffs' Counsel.  The Settlement confers immediate benefits to the Class, particularly in light of the risks of litigating against a Company, which based on its publicly filed financial statements, lacked the financial resources to fund a settlement or pay any judgment, and which holds only a limited "wasting" insurance policy provided by insurers asserting strong bases for disclaiming coverage.  Indeed, the Settlement represents a realistic assessment by knowledgeable attorneys, on both sides, of the risks of further proceedings and is, by any objective measure, fair, reasonable, and adequate.

The Global Settlement enjoys the overwhelming support of the Class.    The Claims Administrator sent approximately 10,635 notices of the proposed Settlement to both Class members (for the Class Action) and current shareholders (for the Derivative Action). McCabe Decl. ¶ 4  To date, no objections to either the Class or Derivative Settlements, the Plan of Allocation, or the fees requested has been filed.  *Id.*  Similarly, neither the Claims Administrator nor the parties' counsel have received any requests, by Class members, for exclusion from the Class Settlement.  *Id.*  Based on the legal and factual hurdles faced by the Lead Plaintiff, the Company's dire financial straits, the substantial nature of the Settlement, and the reaction of the Class members, the Class Settlement is fair, reasonable, and adequate.  Similarly, based on the best interests of the Company, the Derivative Settlement is fair, reasonable, and adequate.

### The Class Action Settlement

The Class Action is brought by the Lead Plaintiff against defendants Citadel Security Software Inc. ("Citadel" or the "Company"), and its then-current officers and directors Steven B. Solomon and Richard Connelly (the "Individual Defendants" together with Citadel, are collectively referred to herein as "Defendants") on behalf of all persons or entities who purchased Citadel securities during the period from February 12, 2004 and December 16, 2004, inclusive, (the "Class" and the "Class Period"). Lead Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule l0b-5 promulgated thereunder and Section 20(a) of the Exchange Act.

At every stage of the litigation, Defendants have asserted strong defenses and expressed a belief that Lead Plaintiff could not prevail on its claims. In deciding to agree to the Settlement, Lead Plaintiff considered the fact that the action involved complex factual and legal issues, including the burden of pleading falsity and scienter under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Plaintiff's Counsel has achieved a very good settlement of this complex securities class action on behalf of Lead Plaintiff and the Class in the face of these obstacles. On September 19, 2006, Lead Plaintiff, the Derivative Plaintiff, and Defendants entered into the Stipulation, filed with the Court, setting forth the terms of the parties' agreement to settle this litigation. Pursuant to that Stipulation, the Settling Defendants and their insurers agreed to pay $1,750,000 in cash into an interest bearing escrow account for the benefit of the Settlement Class. McCabe Decl. ¶ 7.

On both a factual and legal basis, Plaintiff's Counsel respectfully submit that they were and are fully informed as to the advantages, disadvantages, and risks of continued litigation and appeal should Lead Plaintiff have been unsuccessful at trial, the likelihood of success on the merits, and hence, the benefits of a settlement. In addition, the Company has been operating under substantial

financial difficulties.  Because of Citadel's dire financial straits, Lead Plaintiff had to take into consideration that Defendants might be unable to satisfy any judgment, if obtained.

In addressing final approval of the Class Settlement, the Court must consider only one issue; whether the settlement of this Action for $1,750,000 in cash falls within a range that is fair, reasonable, and adequate to the members of the Class.  The Class Settlement, considering the obstacles Lead Plaintiff faced in proving liability and damages and the questionable ability of the Defendants to pay any judgment confirms that the settlement is fair, reasonable, and adequate.

### The Derivative Action Settlement

The Derivative Action is brought on behalf of Citadel named as a nominal Defendant and against Solomon, Connelly, and Chris A. Economou, alleging breach of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that occurred between February 12, 2004 and December 16, 2004, specifically regarding allegedly false and misleading statements that were made to shareholders.

The Derivative Settlement confers an immediate benefit to the Company, in that the burden in litigating the Derivative Action would outweigh any potential remedial measures that would have been received as a result of continued litigation, especially considering the fact that the settlement of the Derivative Action aided in the acquisition of Citadel by McAfee, Inc.  Derivative Counsel conducted a thorough investigation, including locating and interviewing former Citadel employees, and analyzing the Company's corporate governance, corporate structure, the events leading to the litigation and the financial standing of the Company.  Based upon their investigation, and consultation with experts, Derivative Counsel concluded that it was not in the best interest of the Company to pursue the litigation.  Instead, the interest of the Company and its shareholders is best served through obtaining new management and moving forward under McAfee, Inc.  McCabe Decl.

¶ 14.  Indeed, the Derivative Settlement represents a realistic assessment by knowledgeable attorneys, on both sides, of the risks of further proceedings and is, by any objective measure, fair, reasonable, and adequate.

## DESCRIPTION OF THE ACTION AND SETTLEMENT

### History of the Litigation and Summary of Claims

Between January 14, 2005 and March 10, 2005, seven putative securities class action lawsuits were filed on behalf of the representative plaintiffs and all other persons who purchased or otherwise acquired Citadel common stock during a defined time period.  *See* McCabe Decl. ¶ 22. By Orders dated February 14, 2005, February 23, 2005 and March 17, 2005, these actions were consolidated.  *Id.* at ¶ 24.  On May 25, 2005, the Court in the Consolidated Securities Class Action appointed the Citadel Investors Group as Lead Plaintiff, and appointed their choice of counsel, the law firms of Murray, Frank & Sailer LLP and Labaton Sucharow & Rudoff LLP (formerly known as Goodkind Labaton Rudoff & Sucharow LLP) as Co-Lead Counsel and the law firm of Baron & Budd, P.C. as Liaison Counsel.  *Id.* at ¶ 27.

Following the appointment of Lead Plaintiff, a Consolidated Class Action Complaint (the "Complaint") was filed by Lead Plaintiff on August 19, 2005, asserting claims pursuant to §10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder.  *Id.* at ¶ 28.  The Complaint asserts, on behalf of a class of investors, that Defendants Citadel, Steven B. Solomon, Citadel's Chief Executive Officer and a Director of the Company, and Richard Connelly, Citadel's Chief Financial Officer, made materially false and misleading statements in financial statements and press releases concerning Citadel's financial results for 2003 through 2004.  *Id.* at ¶ 29.  Specifically, it is alleged that beginning on February 12, 2004 and extending throughout the Class Period, Defendants publicly announced in press releases and SEC

filings that the Company "expects to report revenues for fiscal 2004 of between $18,500,000 and $21,000,000," as compared to fiscal 2003 revenue of $5,856,296, a projected increase of between 216% to 259%.  *Id.* The Complaint also challenged Citadel's reporting of deferred revenue as of December 21, 2003 and during the Class Period.  *Id.*

Lead Plaintiff alleges that such statements were materially false and misleading when made, and were made without a reasonable basis, because Defendants knew both before and throughout the Class Period that there was no revenue forecasting system in place at Citadel, there was a dry sales pipeline, and there were long lead times from sales through implementation so that sales later in the year of the Company's product, Hercules, could not be recognized as revenue.  *Id.*

On or about April 1, 2005, during the time that the parties in the Consolidated Securities Class Action were litigating issues surrounding the appointment of Lead Plaintiff,  a shareholder derivative suit was filed by the State Derivative Plaintiff in the 193rd State District Court in Dallas County, Texas, captioned *Harry Brantley v. Steven B. Solomon, et. al.*, Case No. 05-03117-L (the "State Derivative Action"), against Citadel as a nominal defendant and against certain of Citadel's officers and directors.  *Id.* at ¶ 25.  The State Derivative Action alleged breach of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment which took place since February 12, 2004 arising out of allegation of the same false and misleading statements made to shareholders as alleged in the Complaint.  *Id.*

On or about April 28, 2005, a shareholder derivative suit was filed by the Federal Derivative Plaintiff in Federal Court, captioned *Hans J. Baier v. Steven B. Solomon, et. al.*, Case No. 3:05-CV-0846-D (the "Federal Derivative Action"), asserting largely the same allegations as the State Derivative Action.  *Id.* at ¶ 26.

On October 18, 2005, Defendants moved to dismiss the Complaint, arguing that their statements regarding their revenue projections and deferred revenue were not actionable. *Id.* at ¶ 32. On or about December 19, 2005, Lead Plaintiff filed and served opposition to Defendants' motion and Defendants replied on February 17, 2006. *Id.* at ¶¶ 33, 34. On September 12, 2005, the parties in the Derivative Action agreed to stay the Derivative Action until 30 days after the Court rules on the motion to dismiss pending in the Class Action. *Id.* at ¶ 31.

**<u>Settlement Discussions</u>**

Beginning in November 2005, Class Counsel began discussing possible settlement with Defendants. On November 17, 2005, Class Counsel Marvin L. Frank discussed potential settlement with Carrie Huff, counsel for Defendants. On November 28, 2005, Mr. Frank sent a letter to Noel Hensley, counsel for Defendants, with a demand for Settlement of the Class Action. This demand was the limits of the Citadel's D&O policy, minus deductions for defense costs. *Id.* at ¶ 36.

Over the course of six months, Class Counsel, Derivative Counsel, and Defendants' Counsel had numerous arms-length settlement discussions. These discussions were so contentious that in the Spring of 2006, the parties even contemplated using a mediator to facilitate the settlement process. During this time, Defendants' Counsel stated that they would settle only if the Class and Derivative Actions were settled concurrently. *Id.* at ¶ 37.

In these discussions, the claims asserted, the potential defenses, and Citadel's prospects and financial condition were discussed. Throughout the settlement negotiations, Class Counsel was advised that Citadel had minimal cash available to fund a settlement, and any settlement funds would come from the $5 million D&O policy. *Id.* at ¶ 38.

After these extensive arms-length discussions, a settlement in principle was reached in April 2006 (after clients in both the Class and Derivative Actions approved the terms), settling both the Class and Derivative Actions. *Id.* at ¶ 40.

Over the next several weeks, Class Counsel, Derivative Counsel and Defendants' Counsel drafted a memorandum of understanding ("MOU") memorializing the terms of the settlement. During that time, conference calls were held, drafts and items of correspondence were exchanged among counsel, and each clause of the MOU was scrutinized. On June 1, 2006, Class Counsel, Derivative Counsel, and Defendants' Counsel executed the MOU, laying out the basic terms of the settlement of the Class and Derivative Actions. *Id.* at ¶ 41. Over the next three months, the parties then worked to draft the definitive Stipulation of Settlement. During this time, numerous additional issues were resolved, including a plan for the allocation of the Settlement Fund. Similarly, many conference calls were held, drafts and items of correspondence were exchanged among counsel, and each clause of the Stipulation of Settlement was scrutinized. The Stipulation of Settlement was executed on September 19, 2006. *Id.* at ¶ 42.

**Benefits Of The Proposed Settlement**

After substantial factual investigation and legal analyses of the claims and defenses of the parties, Plaintiffs' Counsel entered into the Stipulation. The Settlement provides for a fund of $1,750,000 in cash, to be paid by the Defendants, to provide a benefit for the Class members in the Class Action and to cover the costs of the litigation and claims administration. *Id.* at ¶ 11. The $1,750,000 in cash, less such attorney's fees and expenses as may be awarded by the Court, notice and administration expenses, and any tax expenses payable from the Settlement Fund (the "Net Settlement Fund"), shall be distributed to Authorized Claimants (*i.e.*, Class Members who file timely and valid Proofs of Claim) in accordance with the Plan of Allocation described below. *Id.*

Lead Plaintiff estimates that the average recovery per damaged share of Citadel common stock under the Settlement is $0.11 per damaged share before deduction of Court awarded attorney's fees and expenses. *Id.* at ¶ 13. At the time of the execution of the MOU and formalization of the Settlement, Citadel common stock had an average daily closing price of $0.571 per share.[5] Thus the Settlement represents an approximate return of 19.2% of the value of each share of Citadel common stock for each Authorized Claimant. *Id.*

Furthermore, as discussed previously, the parties have also agreed to settlement of the Derivative Action. *Id.* at ¶ 40. The Derivative Action was brought on behalf of the Company, and not the shareholders directly, and members of the Class will not receive any direct monetary compensation from the Settlement of the Derivative Action. Counsel in the Derivative Action, however, has determined that there is substantial benefit to the Company in this Settlement versus the harm that the Company would suffer if the Derivative Actions were to proceed. *Id.* at ¶ 14. Thus, the Derivative Action, whose allegations arose from the same issues that underlay the Class Action, were settled to avoid unnecessary distraction to Citadel's management and harm to the future operations of the Company. *Id.* This is especially true, being that during 2006, Citadel sought to be acquired by another company, and is currently in the process of being acquired by McAfee, Inc. *Id.* at The Derivative Action could have hindered the consummation of this deal. *Id.*

### The Court's Order Preliminarily Approving the Settlement and the Comprehensive Pre-Hearing Notice Program

On September 19, 2006, the parties submitted the Stipulation of Settlement and other papers, including a Preliminary Order, providing for notice and setting a final approval hearing on the

---

[5] This average is based upon the daily closing share price of Citadel securities for the three weeks prior to and after the execution of the Stipulation.

Proposed Settlement; a form of Notice of Proposed Settlement of Class Action and Derivative Action, Motion for Attorneys' Fees and Fairness Hearing; a Proof of Claim and Release; a form of Summary Notice of Proposed Settlement of Class Action and Derivative Action, Motion for Attorneys' Fees and Fairness Hearing; and a form of Final Judgment and Order Approving Settlement, and Dismissal with Prejudice, for the Court's review.  *Id.* at ¶ 15.  On or about September 26, 2006, this Court signed the Preliminary Approval Order.  *Id.*

Pursuant to the Preliminary Approved Order, the Claims Administrator retained by Class Counsel caused the Notice and accompanying materials (including the Proof of Claim form, Plan of Allocation, and Release), previously approved by this Court, to be mailed to more than 10,000 potential Class Members, record holders during the Class Period, and/or current holders of Citadel stock as of August 28, 2006.  *Id.* at ¶¶ 15-17.  On October 16, 2006, Plaintiffs' Counsel caused the Summary Notice to be published on the PRIMEZONE wire service in accordance with the Preliminary Approval Order.  *Id.* at ¶ 16.  As of the date of the filing of this brief, Plaintiffs' Counsel have received no objections or opt-outs to the Settlement.  *Id.* at ¶ 17.

To date, no objections have been filed, and no valid requests for exclusion from the Class have been submitted to date.  *Id.*  Plainly, the overwhelmingly positive response by the Class and current holders of Citadel securities to the comprehensive Notice program strongly favors approval of the Settlement.

## ARGUMENT

### I. THE COURT SHOULD GRANT FINAL APPROVAL OF THE SETTLEMENT

#### A. Applicable Standards

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action may not be settled without the approval of the Court, and that notice must be given to the members of the class.

"In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 207 (5th Cir. 1981) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *see Parker v. Anderson*, 667 F.2d 1204, 1208-09 (5th Cir. 1982), *cert. denied,* 459 U.S. 828 (1982). In inquiring into the fairness of the proposed settlement agreement, the court's general goal is to "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983) (quoting *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1978)). The decision whether to approve the settlement is committed to the discretion of the district court. *See Corrugated Container*, 643 F.2d at 207.

In assessing the fairness, adequacy and reasonableness of a class action settlement the Fifth Circuit has articulated six key factors for courts to consider:

(1)    whether the settlement was the product of fraud or collusion;

(2)    the complexity, expense and likely duration of the litigation;

(3)    the stage of the proceedings and the amount of available discovery;

(4)    probability of plaintiffs prevailing on the merits;

(5)    the possible range of recovery and the certainty of damages; and

(6)    the respective opinions of the participants, including class counsel,

        class representatives, and absent class members.

*Newby v. Enron Corp.,* 394 F.3d 296, 301 (5th Cir. 2004) (*citing Reed*, 703 F.2d at 172 and *Parker*, 667 F.2d at 1209). "[I]n weighing the aforementioned factors, it is important note that there is a strong presumption in favor of finding a settlement fair." *Faircloth v. Certified Finance Inc.*, Case No. 99-3097, 2001 WL 527489, at *3 (E.D. La. May 16, 2001) (*citing Neff v. VIA Metropolitan*

*Transit Auth.*, 179 F.R.D. 185, 208 (W.D. Tex. 1998)); *see also Cotton*, 559 F.2d at 1331.

Moreover, "a court should consider the 'public policy interest in favor of settlement of class action

lawsuits[.]'" *Schwartz v. TXU Corp.*, Case No. 02-CV-2243, 2005 WL 3148350, at *17 (N.D. Tex.

Nov. 8, 2005) (*citing Cotton*, 559 F. 2d at 1331).[6]

    As discussed more fully below, application of these standards warrants final approval of the

Settlement as fair, reasonable and adequate.  Counsel for all parties have had a thorough opportunity

to weigh the strengths and weaknesses of the parties' respective positions in the event of trial, and,

after extensive negotiations, have reached an informed and carefully crafted compromise based on

their analyses.

---

[6] When assessing the fairness of a class action settlement, the trial judge "must not try the case in the settlement hearings because the very purpose of the compromise is to avoid the delay and expense of such a trial." *Reed,* 703 F.2d at 172; *see Cotton*, 559 F.2d at 1330 ("It cannot be overemphasized that neither the trial court in reviewing the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."). Rather, "[t]he very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise [*i.e.,* behind the enactment of Rule 23(e)]. This is a recognition of the policy of the law generally to encourage settlements.  This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty." *Corrugated Container*, 643 F.2d at 212.  Put another way, "[t]he trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Cotton*, 559 F.2d at 1330 (citation omitted).

**B.    The Settlement Is Fair, Adequate and Reasonable
Under Factors Articulated By the Fifth Circuit**

**1.    The Settlement Is the Product of Extensive Arm's-
Length Negotiations Among Sophisticated Parties and
Experienced Counsel, and There Is No Trace of  Fraud
or Collusion**

The proposed $1.75 million Settlement was entered into by the parties in good faith, at arm's

length, and without a trace of fraud or collusion, and thus should be approved by the Court. *See*

*Cotton*, 559 F.2d at 1330 (a settlement should be approved when it is "fair adequate, and reasonable

and is not the product of collusion between the parties"); *Newby*, 394 F.3d at 308 (evidence that the

settlement was obtained by fraud or collusion is a factor in deciding the appropriateness of the

settlement).

The first factor set forth by the Fifth Circuit, whether the proposed settlement was the result

of fair and honest negotiations, fully supports the conclusion that this Settlement merits the Court's

approval.  This Settlement is the product of hard fought negotiations, extending over a period of

months, including the negotiations over the possible participation of an independent mediator as

discussed above.  The arm's-length negotiations were conducted by capable counsel on both sides

who are well experienced in securities class actions.  *M. Berenson Co. v. Faneuil Hall Marketplace,*

*Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987) ("Where, as here, a proposed class settlement has been

reached after . . . arm's length negotiation, conducted by capable counsel, it is presumptively fair.").

As set forth above and in the McCabe Declaration, this litigation was marked by tenacious

and vigorous advocacy from the outset.  Indeed, negotiations that resulted in the Settlement were

equally adversarial and hard fought.  The negotiations included presentations and arguments

concerning the merits of Plaintiff's claims and Defendants' defenses, as well as the amount of

potential damages.  McCabe Decl. at ¶¶ 46-47.  Moreover, Plaintiffs' Counsel were in a position to

critically assess the litigation, as they had completed an extensive investigation in connection with

the preparation of the Complaint – including the review of the Company's publicly available documents and interviews with over 20 of the Company's former employees. *Id.* at ¶ 28. As such, Plaintiff's Counsel possessed the "desired quantum of information necessary to achieve a settlement." *Cotton*, 559 F.2d at 1332.

Furthermore, the Settlement was reached after many settlement negotiations. The negotiations were protracted and even the process of finalizing the settlement took several months after an agreement in principal was reached. McCabe Decl. at ¶ 37. Nevertheless, the parties persevered through these difficulties until they obtained a final settlement agreement. Counsel for the parties zealously represented their clients' interests throughout the process. The fair and honest nature of the negotiations is further evidenced by the fact that throughout these discussions, all parties were represented by counsel with vast experience in securities litigation. Plaintiffs' Counsel, for example, brought many years of litigating securities fraud actions and negotiating settlements in other actions to the bargaining table. *Id.* at ¶ 68.

Clearly, all parties were zealously represented throughout the negotiations by sophisticated, able, and experienced counsel. These facts are demonstrated by the time and effort it took the parties to ultimately reach agreement on critical issues of the Settlement and, thus, show that the Settlement was entered into at arm's-length and without collusion. *See Reed,* 703 F.2d at 175 ("Because the trial judge must predict, the value of the assessment of able counsel negotiating at arm's length cannot be gainsaid."); *Faircloth*, 2001 WL 527489, at *4 ("All of the attorneys involved in the case remained zealous advocates, vigorously representing their client's interests throughout the entire litigation process, including the settlement negotiations.").

## 2.    Continued Litigation Would Be Extremely
##    Complex, Costly, and Lengthy

Without a settlement, the anticipated complexity, cost, and duration of continued litigation in this action is considerable.  Securities cases of this nature are undoubtedly complex. *Schwartz*, 2005 WL 3148350, at *18 (litigation relating to securities fraud claims involves "fact-intensive and difficult to prove claims [and] would thus be extraordinarily complicated and time consuming, and require expert testimony.") (citing cases).   In the instant case the Complaint asserts two causes of action –one pursuant to Section 10(b) of the Exchange Act and the second pursuant to Section 20(a).  These claims arise out of the Company's allegedly false financial statements and involve complex and difficult to prove issues of, *inter alia,* fraud, scienter, controlling person liability, and loss causation, and must be pled and proved according the heightened pleading standards of the PSLRA.  *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 409-412 (5th Cir. 2001) (analyzing and acknowledging the difficulties prosecuting securities fraud claims pursuant to the PSLRA); *see also Lewis v. Newman*, 59 F.R.D. 525, 528 (S.D.N.Y. 1973) ("It must be recognized that stockholder litigation is notably difficult and notoriously uncertain.  This case is no exception.  It is easy enough to draft a complaint, alleging a cause of action under section 10(b), but it is quite another matter to establish free wheeling charges of fraud or manipulative conduct.").

Additionally, as further discussed below, the issue of establishing and proving damages in a 10(b) case is no small feat and is highly dependent upon expert testimony.  However, recent cases create a risk that such expert testimony could be excluded at trial in response to a motion made under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See, e.g., Carpe v. Aquila, Inc.*, Case No. 02-0388, 2005 WL 1138833, at *4 (W.D. Mo. March 23, 2005) (excluding plaintiffs' damages expert in securities fraud case because expert analysis did not comport with *Daubert* and its progeny); *Kaufman v. Motorola, Inc.*, No. 95 C 1069, 2000 U.S. Dist. LEXIS 14627, at *5-6 (N.D.

Ill. Sept. 19, 2000) (excluding plaintiffs' evidence of class-wide damages in securities fraud class action).

Although Lead Plaintiff has already spent significant time reviewing publicly available documents and obtaining information from several confidential witnesses -- many of whom provided critical information alleged in the Complaint and relied upon in the opposition to the Defendant's motion to dismiss  (McCabe Decl. at ¶ 28) -- the cost of further litigation on issues of liability, damages, and class certification, then trial and possible appeal, would vastly exceed the substantial time and money already spent.  The court's reasoning in *Feinberg v. Hibernia Corp.*, 966 F. Supp. 442, 445 (E.D. La. 1997), a securities class action, is instructive:

> This case is factually and legally complex.  The question of liability was complicated, involving, among other issues, whether the statements and disclosures made by the defendants were in fact false and misleading…Deciding those issues would have required review of numerous and complex corporate transactions, an understanding of accounting, banking and regulatory procedures and resolving conflicting expert testimony.  Assuming liability, the calculation of damages would also be complex.  Thousands of class members bought their stock at different times during the class period.  Issues of what the defendants said and when and how it affected the value of the stock would have to be resolved.  All of this would have called for a lengthy and expensive trial, with the losing side virtually certain to appeal.

> *Id.* at 445.

While denying liability, Defendants considered their options and agreed to a fair settlement now, thereby avoiding protracted, expensive litigation that might (like many class actions) culminate in a settlement nonetheless.  At the same time, Lead Plaintiff, aware of the precarious financial position of the Company, determined that settlement at this time was extremely beneficial to the Class.  McCabe Decl. at ¶ 8. The immediate and certain availability of the $1.75 million Settlement Fund militates strongly in favor of final approval.  *See Faircloth,* 2001 WL 527489, at *5 (Under the settlement agreement, the class members will receive immediate cash benefits without future delay.").

Nonetheless, as discussed in greater detail above and in the McCabe Declaration, Plaintiff's Counsel realized that that they faced numerous risks and uncertainties, including the risk that the Court would grant the motion to dismiss.  Moreover, Plaintiff's Counsel were aware that many other securities class actions had been prosecuted in the belief that they were meritorious, only to lose on motions to dismiss, motions for summary judgment, at trial, or on appeal.[7]

### 3. The Stage Of The Proceedings And The Amount Of Available Discovery

"Formal discovery is not a prerequisite to settlement."  *Schwartz,* 2005 WL 3148350, at *19; *see also Corrugated Container*, 643 F.2d at 211.  The Fifth Circuit has clearly held that formal or extensive discovery is *not* required prior to settlement of a class action, as long as there is a factual basis for the settlement and the interests of the class are not prejudiced by the settlement.  *Newby,* 394 F.3d at 306.

In the instant case, the parties reached a fair and equitable settlement prior to the commencement of formal discovery because the mandatory PSLRA discovery stay was still in effect at the time pending resolution of Defendants' motion to dismiss.    Nonetheless, Class Counsel negotiated this Settlement with a thorough knowledge of the merits and value of the parties' respective positions.   Prior to filing the Complaint, Class Counsel conducted an extensive investigation into all publicly available information.    McCabe Decl. at ¶ 28.  [In addition, Class Counsel interviewed over 20 former employees, and identified five confidential sources, including a

---

[7] Other plaintiffs have won huge judgments at trial, only to lose on appeal.  *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (action dismissed following 11 years of litigation and a $30 million judgment for plaintiffs following trial that was largely affirmed by the first appellate panel); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979); *Piper v. Chis-Craft Indus., Inc.*, 430 U.S. 1 (1977) (reversing Second Circuit's award of damages under Williams Act in amount of $25,973,365 after eight years of litigation).

former Citadel executive, a former sales manager, a former group engineering manager, a former sales representative and a former executive vice-president of the Company.    *Id.*  Class Counsel spent significant time locating and obtaining valuable information from these witnesses, who ultimately provided the invaluable information regarding allegedly fraudulent activity at Citadel. *Id.*  In addition, Lead Plaintiff retained a damages expert who prepared a sophisticated analysis of the estimated damages sustained by purchasers and acquirers of Citadel stock during the Class Period.    *Id.* at ¶ 46.  Lead Plaintiff consulted with this expert on a regular basis as settlement negotiations progressed.  *Id.*

Settlement negotiations began as the parties were in the process of briefing Defendants' motion to dismiss.  Subsequently the parties had numerous settlement discussions, and since Class Counsel had previously had the opportunity to review numerous public documents, obtain the information provided by several former employees of the Company, and retain a damages expert, Lead Plaintiff had a thorough understanding of the strong points and weak points of the case, the financial condition of the Company, the available insurance coverage, the likelihood of success at trial, and the likely recovery on a litigated judgment, at the time the Settlement was ultimately reached and the Stipulation of Settlement signed by the parties-- even though formal discovery had not yet begun.  *Schwartz*, 2005 WL 3148350, at *19-20 (finding that investigation of lead counsel prior to commencement of formal discovery was sufficient to apprise lead plaintiffs of the "merits of their case" prior to settling).

Accordingly, since Lead Plaintiff was more than knowledgeable about the merits of the case and the recoverability of a judgment before and during settlement, this factor strongly favors final approval of the Settlement.

### 4.    Lead Plaintiff Faced Substantial Factual
### and Legal Obstacles to Prevailing on the Merits

"Once the issue of possible fraud or collusion behind the settlement is resolved, the next most important factor in deciding the fairness, adequateness, and reasonableness of the settlement is the likelihood of plaintiffs' success on the merits if the case were to proceed to trial." *San Antonio Hispanic Police Officers' Org. v. City of San Antonio*, 188 F.R.D. 433, 459 (W.D. Tex. 1999) (*citing Parker*, 667 F.2d at 1209); *Neff*, 179 F.R.D. at 210 (same). Recognizing the uncertainty of litigation, the Fifth Circuit held long ago that to approve a proposed class action settlement, a plaintiff must establish only that, all things considered, "it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end." *Florida Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960).

Here, there is significant uncertainty as to whether Lead Plaintiff would be able to prove liability and damages for the losses Class Members sustained as a result of Citadel's allegedly false and misleading statements during the Class Period. For example, among the numerous arguments that Defendants assert in their motion to dismiss, first and foremost it is argued that the allegedly fraudulent statements made by Defendants are in fact forward-looking statements accompanied by meaningful cautionary language, and therefore, are shielded from liability under the safe harbor provision of the PSLRA. McCabe Decl. at ¶ 32. Defendants argue that these statements are precisely the types of statements contemplated by such provision. Further, Defendants argue that the second prong of the safe harbor provision requires the pleading of specific facts that demonstrate that Defendants' Solomon and Connelly actually knew that their projections were false. *Id*. Therefore, even if Lead Plaintiff could successfully prove that the false and misleading statements were *not* forward-looking statements accompanied by meaningful cautionary language, in order to successfully prove liability, Defendants contend that Lead Plaintiff would still need to prove

Solomon and Connelly's actual knowledge of the falsity of those statements at the time they were made simply to overcome the safe harbor provisions of the PSLRA--an incredibly difficult burden to prove.  Other allegations of the Consolidated Complaint involve issues of when revenue may be recognized under rules that often turn on matters of judgment rather than bright line tests.  Expert testimony would be required and the jury would have to determine which of the competing experts' views to accept.  Additionally, Lead Plaintiff would also be confronted with issues of scienter, loss causation and control person liability.  Courts have held that cases involving such issues are difficult to prove and settlement properly mitigates the risk to the Class.  *See Schwartz*, 2005 WL 3148350, at *18 (the difficulty in proving essential elements of a 10(b) claim, including falsity and scienter, weigh in favor of settlement which guarantees class members a certain and fast recovery).

Moreover, evidenced by the Company's publicly filed financial statements, Lead Plaintiff was concerned that Citadel might enter bankruptcy, either voluntarily or involuntarily, during the pendency of the action.  Citadel's Form 14-A, filed November 3, 2006, at 23-24.  Citadel experienced net losses during 2004 and 2005 and expected net losses throughout the first three quarters of 2006.  *Id.* at 26.  In fact, Citadel stated that such losses "could continue in the future" and "might inhibit our ability to execute our strategy due to cash constraints."  *Id.* at 31.  In 2005, Citadel initiated a restructuring program to curb these losses, but revenues were still insufficient to cover operating expenses.  *Id.* at 26.  Citadel's financial problems were exacerbated by the fact that its stock price was falling; Citadel was even delisted from the NASDAQ in May 2006 because it fell below NASDAQ's minimum $1 trading price.  *Id.* at 23.

In addition to having virtually no earnings, the Company had little cash on hand and a looming debt repayment structure.  In 2006, Defendant Solomon lent Citadel $3 million to provide cash for a working capital shortfall.  *Id.* at 27.  However, as of November 2006, Citadel had only

$850,000 in available cash.  *Id.* at 2.   Thus, Citadel was burning through its available cash at a significant rate.  At the same time, Citadel had to: 1) repay $3.75 million to its senior secured lender in October 2007; 2) repay the $3 million to Mr. Solomon in January 2007; and 3) redeem its Series A preferred stock in February 2008 and Series B preferred stock in July 2008 for $15,000,000 and $7,000,000, respectively, plus redemption premiums.  *Id.* at 13.  Thus, in 2007 and 2008, many loans and other financial obligations undertaken by Citadel would mature, and Citadel could be faced with an inability to repay the lenders and creditors.   Furthermore, due to financial conditions, plus existing financing arrangements, Citadel was unable to obtain additional financing.  *Id.* at 30-31.  While Citadel was subsequently acquired by McAfee, Inc., had Citadel not been acquired by another company, Lead Plaintiff was reasonably concerned that it would have been forced to enter bankruptcy due to the possibility that it would be unable to raise additional capital, and/or pay its debts.

Lead Plaintiff was concerned about this danger.  If the company were to declare bankruptcy before the case was settled, it is possible that, not only would Lead Plaintiff have a difficult time obtaining a settlement from Citadel directly, but creditors in the bankruptcy could attempt to claim the proceeds of the D&O policy.  While the case law is quite complex concerning the circumstances under which a D&O policy becomes part of a debtor's estate, *see In re Vitek, Inc.*, 51 F.3d 530, 535 (5th Cir. 1995), it is possible that potential creditors might attempt to claim the proceeds of such a policy.  This could delay any recovery from the D&O policy by several years.  If it was found that the D&O policy was part of the estate, the Class would not receive the benefit of the policy.  Accordingly, Citadel's potential bankruptcy was a key risk that was considered in regard to the Settlement.  *See Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 547 (D. Colo. 1989) (an "important consideration is the continuing existence of [the Company]. . .If the litigation continues,

the potential for bankruptcy is real, after which recovery from the corporation is questionable. Moreover, litigation is costly and the vagaries of litigation are legion.").

Given the breadth of difficult legal and factual issues on which Lead Plaintiff would be required to prevail in order to successfully prosecute this claim to conclusion, and which have not yet even been tested on a motion to dismiss, this factor strongly supports approval of the Settlement.

### (a)    The $1.75 Million Settlement Amount Is an Excellent Recovery in Light of the Range of Potential Recovery at Trial

Lead Plaintiff's damages expert has estimated that if Lead Plaintiff proved all of its claims at trial with respect to the Class Period, the Class Members who invested during that period would recover a maximum of approximately $30 million in damages.  McCabe Decl. at ¶ 46.  Under the terms of the Settlement and Plan of Allocation, a total of $1.75 million (less deductions for attorneys' fees and expenses and other costs) will be distributed to Class Members who purchased or acquired common stock during the Class Period.  *Id.* at ¶ 11.  This $1.75 million amount represents, on average, a settlement recovery of approximately 6% of estimated maximum damages, an amount that is not unreasonable under the circumstances.  *Id.* at ¶ 46.  "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Parker*, 667 F.2d at 1210, n.6 (*quoting City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 (2nd Cir. 1974)).  "'In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'"  *Id.*; *see also In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 183-84 (E.D. Pa. 2000) (approving settlement amounting to 5.2% of damages for common stock holder); *In re Union Carbide Corp. Consumer Products Bus. Sec. Litig.*, 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989) ("The Court of Appeals had held that a

settlement can be approved even though the benefits amount to a small percentage of the recovery sought … The essence of settlement is compromise.") (Citation omitted).

In this case, the Settlement represents a substantial benefit to the Class members and should be approved.  First, as a result of the Settlement, the average recovery per damaged share, if all Class members file proofs of claim, is expected to be $0.11, prior to the deduction of expenses and attorneys' fees.  McCabe Decl. at ¶ 13.  At the time the MOU was signed and the Settlement was agreed upon and reduced to writing by the parties, the average closing price per share of Citadel common stock was $0.571. *Id.*  Consequently, the recovery represents an additional 19.2% of the value of the stock at the time Settlement was reached.  Second, as discussed previously, at the time the Settlement was negotiated the financial future of Citadel was very uncertain.  Therefore, even assuming a jury returned the most favorable possible verdict with respect to the claims for the Class Period, and the damages award was upheld by the Court and sustained on appeal, Class Counsel believed there were serious questions as to whether Defendants would be able to pay a verdict in the $30 million range.   However, the Settlement Fund, if approved now, will be solvent and available.  This fact militates in favor of final approval of the Settlement, because "a judgment against defendants who cannot pay is worthless." *See In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 498 (N.D. Miss. 1996) ("When the court considers not only the potential provable damages in this suit, but also . . . the ability of the defendants to actually pay such a large award, it is apparent that this factor favors approval of the settlement agreements in this case."); *Faircloth.*, 2001 WL 527489, at *5.  Accordingly, this factor strongly favors approval of the Settlement.

### 5.    Lead Plaintiff, Absent Class Members, and
### <u>Lead Counsel Strongly Support the Settlement</u>

Finally, the participants in this action overwhelmingly support the Settlement and recommend that it be approved.  Lead Plaintiff, a sophisticated group of investors, also submits that the Settlement is fair, adequate and reasonable and should be approved.

The opinions of absent class members also strongly favor final approval of the Settlement. Zero Class Members chose to opt-out of the case in response to the Notice.  McCabe Decl. at ¶ 17. Similarly, zero Class Members filed an objection to the Settlement.  *Id.*  The lack of opt-outs and objections militates in favor of final approval of the Settlement.  *See, e.g., In re Train Derailment Near Amite Louisiana,* Case No. Civ. A. MDL 1531, 2006 WL 1561470, at *25 (E.D. La. May 24, 2006) (fact that not one person filed an objection to settlement nor appeared at the fairness hearing to oppose the settlement weighs heavily in favor of the settlement); *In re Lease Oil Antitrust Litig. No. II*, 186 F.R.D. 403, 432 (S.D. Tex 1999) (approval of settlement favored where fewer than 1% of class opted-out).

Finally, Class Counsel, who have extensive experience representing plaintiffs in securities fraud litigation, submit that the Settlement is fair, adequate and reasonable.  McCabe Decl. at ¶ 68. As stated above, Class Counsel recommended that Lead Plaintiff agree to the Settlement based on Class Counsel's substantial and careful investigation and evaluation of the facts and law relating to the allegations in the Consolidated Complaint.  *Id.*  In entering into the Settlement, Class Counsel considered, among other things, (i) the substantial cash benefits to Class Members under the terms of the Stipulation; (ii) the uncertainty of being able to certify a litigation class in this matter; (iii) the difficulties regarding proving certain of the allegations in the Consolidated Complaint; (iv) the attendant risks of litigation, especially in a complex action such as this; (v) the delays inherent in such litigation, including possible appeals; (vi) the uncertainty inherent in the various theories of

damages, even if Lead Plaintiff could establish liability on the part of Defendants; (vii) the desirability of consummating the Stipulation promptly in order to provide timely relief to Class Members; and (viii) the potential that even if liability could be established and a favorable verdict obtained, a judgment could not be enforced against a potentially insolvent Defendant.  *See also Lease Oil*, 186 F.R.D. at 432 (crediting views of experienced class counsel regarding fairness of settlement).

## II.    THE PLAN OF ALLOCATION OF THE NET SETTLEMENT FUND IS FAIR, ADEQUATE AND REASONABLE AND SHOULD BE APPROVED

The Net Settlement Fund will be distributed to Class Members who establish membership in the Class and submit a complete, valid and timely Proof of Claim form and required documentation, in accordance with the detailed plan of allocation ("Plan" or "Plan of Allocation") set forth in the Notice.  "Approval of a plan of allocation of settlement proceeds among the members of the Class under Federal Rule [of Civil Procedure] 23 is governed by the same standard of fairness, reasonableness and adequacy applicable to approval of the settlement as a whole."  *Schwartz*, 2005 WL 3148350, at *23 (*citing In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1982); *see also Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992)).

The Plan, as discussed in greater detail in the Notice, treats every member of the Class in a similar manner — everyone who submits a valid and timely claim (and does not exclude himself from the Class) gets a *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's (defined as a member of the Class who submits an acceptable Proof of Claim) "Recognized Claim." The "Recognized Claim" as described in the Plan, is a calculation used to arrive at a weighted loss figure for purposes of calculating an Authorized Claimant's *pro rata* participation in the Net Settlement Fund.  McCabe Decl. at ¶ 49.

The Plan was developed by Class Counsel with assistance from the Claims Administrator Paul Mulholland. Lead Plaintiff considered the Plan, believes it is fair to all Class Members, and recommends that it be approved. *Id.*

## III.    THE CLASS SHOULD BE CERTIFIED UNDER RULE 23

Rule 23 governs the issue of class certification, whether the proposed class is a litigation class or, as here, a settlement class. *Amchem Prods.Inc. v. Windsor*, 521 U.S. 591, 620 (1997). "In order to certify [a] settlement class, the court must find that the proposed class meets the four threshold requirements of the Federal Rules of Civil Procedure 23(a) – numerosity, commonality, typicality and adequacy of representation…" *Schwartz,* 2005 WL 3148350, at *12. In addition, a plaintiff must establish that the action is maintainable under Rule 23(b)(3), by showing "that common questions 'predominate over any questions affecting only individual members' and the class resolution [to] be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id*.

Certification of a class for settlement purposes requires that the class meet the same criteria as are required for certification for litigation purposes, except that "a district court need not inquire whether the case, if tried, would present intractable management problems [under Rule 23(b)(3)(D)], for the proposal is that there be no trial." *Amchem,*, 521 U.S. at 620. The Supreme Court has ruled that courts may properly certify classes for settlement purposes only. *Id.* at 621-622.

In the instant case, the Class meets each prerequisite of Rule 23, therefore the Class should be certified for purposes of the Settlement described herein.

### A.    Numerosity

Rule 23(a)(1) requires that a proposed class be so numerous that joinder of all class members would be impracticable. To meet this requirement, the class representative need only show that it is difficult or inconvenient to join all members of the class. *Henry v. Cash Today, Inc.*, 199 F.R.D.

566, 569 (S.D. Tex. 2000).  "[T]he prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities."  *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981) (reasoning that in securities actions, the active trading of millions of shares of stock is ordinarily a sufficient showing for numerosity).

More than 10,000 Notices were mailed to potential class members scattered across the United States.  McCabe Decl. at ¶ 4.  Clearly the number of class members is too numerous for efficient individual adjudication, and thus, satisfies the numerosity requirement. *Zeidman,* 651 F.2d at 1039.

### B.    Commonality

"Rule 23(a)(2) requires that questions of law or fact exist that are common to the class." *Schwartz*, 2005 WL 3148350, at * 13.  "The test for commonality is not demanding and is met 'where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.'"  *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 625 (5th Cir. 1999) (quoting *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)); *see also Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F. 3d 290, 296-297 (5th Cir. 2001).  The commonality requirement "does not require complete identity of legal claims among the class members." *Stewart v. Winter*, 669 F.2d 328, 339 (5th Cir. 1982).

In the present case, there are a host of issues whose resolution will affect virtually all members of the Class.  First, the alleged misrepresentations and omissions are common to all members of the Class -- namely the projected revenue increase of approximately 216%-259% and the improper deferral of revenue.  Second, the proofs regarding the existence and nature of the material misstatements and omissions and why they were misleading are common to all members of the Class, and third, the Lead Plaintiff's and the Class' damages all arise from the same operative facts and are based upon similar legal theories.   Accordingly, virtually all of the questions of law

and fact in this action are common to Lead Plaintiff and all members of the Class, and thus the requirements of Rule 23(a)(2) are satisfied.

###    C.    <u>Typicality</u>

"Rule 23(a)(3) requires that the claims of the class representative not differ significantly from the claims of the class as a whole." *Schwartz*, 2005 WL 3148350, at *13.

> [T]he test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class.

*Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (*quoting James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)); *see also Mullen*, 186 F.3d at 625.[8]

When the claims of both the class representative and the absent Class members arise from the same course of conduct and are based on the same legal theory, the typicality requirement is generally satisfied even if there are factual differences between the claims of the named plaintiffs and the other class members. *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 955 (E.D. Tex. 2000) (citing *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

Here, Lead Plaintiff's claims are typical of the claims of the members of the Class in that Lead Plaintiff and each Class member purchased Citadel securities during the Class Period in an artificially inflated market and sustained injury as a result. *Schwartz*, 2005 WL 3148350, at *13-14 (finding typicality where lead plaintiffs and class members claims all arose from the same false and

---

[8] "[T]ypicality of claims in a settlement class context requires proof that the interests of the class representative and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement. This is a much simpler proposition than showing typicality in an ongoing litigation context, wherein all elements of liability and damages must be analyzed to determine common questions affecting both the class representative and the class." 2 NEWBERG ON CLASS ACTIONS, § 11.28.

misleading statements made by defendants and where those misrepresentations caused the same artificial inflation in lead plaintiffs' and class members' shares). Accordingly, the typicality requirement for class certification has been met. Since Lead Plaintiff stands in the same position as other Class members, Lead Plaintiff's claims are typical of those held by other Class Members.

### D.    **Adequacy of Representation**

In this Circuit, the resolution of two questions determines adequacy: "(1) the counsel must be qualified and experienced, and (2) the representatives must not have antagonistic interests with class members." *Lease Oil*, 186 F.R.D. at 421; *Henry*, 199 F.R.D. at 569. *See also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-80 (5th Cir. 2001), *clarified on reh'g en banc*, 279 F.3d 313 (5th Cir. 2002).

Here, as the firm résumés attached to the McCabe Declaration attest, Lead Counsel have wide experience in the type of action before the Court and were fully able to adequately represent the interests of the Class. Further, Lead Plaintiff has no interests antagonistic to the interests of the other members of the Class. *Neff,* 179 F.R.D. at 195; *Shaw*, 91 F. Supp. 2d at 955 ("A sufficient alignment of interests exists when 'all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class.'"); *Schwartz,* 2005 WL 3148350, at *15 (citing *Berger*, 257 F.3d at 482) ("In the Fifth Circuit, two criteria have been articulated for determining adequacy of representation: (1) whether the named representative shares a common interest with other class members, and (2) whether the named representative will vigorously prosecute the interests of the class through the class counsel."). Here, Lead Plaintiff satisfies these criteria.

### E.    **The Action Satisfies the Requirements of Rule 23(b)(3)**

To certify the Class, the Court must also find that the action satisfies the requirements of Rule 23(b). To maintain a class action under Rule 23(b)(3), the representative plaintiffs must show

that (1) common questions predominate over any questions affecting only individual members, and (2) the class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. *See Mullen*, 186 F.3d at 623-24. The matters pertinent to the predominance and superiority findings include:

> (1) the interest of the members of the class in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D); *see also Henry*, 199 F.R.D. at 570. Of the thousands of Class members damaged by the conduct alleged in the Consolidated Complaint, only 7 commenced their own actions. This Court recognized that judicial efficiency required consolidation and has designated Lead Plaintiff to prosecute a Consolidated action on behalf of all persons similarly situated.

### 1.    Common Questions of Law and Fact Predominate

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. In order for common questions of law or fact to predominate, "common issues must constitute a significant part of the individual cases." *Mullen*, 186 F.3d at 626. The test is "readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625 (distinguishing asbestos and personal injury cases); *Longden v. Sunderman*, 123 F.R.D. 547, 554-57 (N.D. Tex. 1998) (predominance requirement readily met in securities class actions).

Lead Plaintiff has shown above that numerous important questions of law and fact are common to the members of the Class. These questions clearly predominate over any conceivable individual questions, because defendants' alleged misconduct was part of an overall course of

conduct that affected the members of the Class in the same manner.  Inasmuch as the claims against Defendants here arise out of the same set of operative facts and are based on common legal theories, the predominance of common questions of law and fact is clear.  Courts have found the predominance requirement satisfied where a defendant's alleged liability arises from its dissemination of false and misleading statements.  *Ikon,* 194 F.R.D. at 177; *see also Longden*, 123 F.R.D. at 554-57 (defendants' common course of misconduct, where investors were mislead by similar misrepresentations, predominated over individual issues).  The Class satisfies the predominance requirement.

In determining predominance, courts examine whether the security traded in an efficient market.  This Circuit looks to the following factors when determining market efficiency:

> 1) the average weekly trading volume expressed as a percentage of outstanding shares; 2) the number of securities analysts following and reporting on the stock; 3) the extent to which market makers and arbitrageurs trade in the stock; 4) the company's eligibility to file SEC registration Form S-3 (as opposed for Form S-1 or S-2); 5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; 6) the company's market capitalization; 7) the bid-ask spread for stock sales; and 8) float, the stock's trading volume without counting insider-owned stock.

*Barrie v. Intervoice-Brite*, No. 3-01-CV-1071-K, 2006 WL 2792199, at *6 (N.D. Tex. Sept. 26, 2006) (*citing Bell v. Ascendant Solutions, Inc.,* 422 F.3d 307, 313 n. 9 (5th Cir. 2005); *Unger v. Amedisys Inc.,* 401 F.3d 316, 323 (5th Cir. 2005); *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J.1989)).

Citadel meets all of the eight factors.  First, Citadel's average weekly trading volume, as a percentage of outstanding shares, is approximately 5%, far in excess of the 1-2% minimum courts have found to support market efficiency.  *See Barrie*, 2006 WL 2792199, at *6.  Second, many securities analysts followed the stock, including Kaufman Brothers, Brean Murray & Co., Wachovia

Securities, Fulcrum Global Partners, and America's Growth Capital.  <u>Third</u>, over 80 market makers and arbitrageurs traded in the stock during the Class Period.  <u>Fourth</u>, Citadel was eligible to file Form S-3's, and in fact filed two during the Class Period: an S-3 on March 25, 2004, and an S-3/A on March 25, 2004.  <u>Fifth</u>, there was a causal effect between financial news and the response to the stock price.  As stated in the Complaint at ¶ 112, the stock price dropped 41% on December 16, 2004 when Citadel provided a financial update for the year-end 2004.  <u>Sixth</u>, the company's market capitalization, as of March 10, 2004, as reflected in their 2003 Form 10-KSB filed during the Class Period, was approximately $172 million.  <u>Seventh</u>, during the Class Period, the Bid-Ask spread was often within $0.05 to $0.10, reflecting a high level of liquidity and efficiency.  <u>Eighth</u>, according to the 2003 10-K, as of March 10, 2004, there were over 29 million shares of common stock, and less than 8 million were owned by officers and directors of the company.  Thus, as of that date, over 21 million shares, or $126 million, of common stock was owned by non-insiders of the company. Accordingly, all of the eight factors above have been met.

### 2.    A Class Action is the Superior Method of Adjudicating this Controversy

"The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  *Lease Oil,* 186 F.R.D. at 428 (quoting *In re Prudential Ins. Co. of Am.  Sales Practice Litig. Agent Actions,* 148 F.3d 283, 316 (3d Cir. 1998)).  In considering superiority, a court should be mindful of the policy underlying Rule 23 to "achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *Henry*, 199 F.R.D. at 570 (quoting *State of Alabama v. Blue Bird Body Co*., 573 F.2d 309, 315 (5th Cir. 1978)).

As noted above, "where a settlement class is presented, the trial court need not consider the manageability of the class at trial[,]" because "the remaining three superiority factors plainly indicate that a class action is the best vehicle for conducting th[e] litigation." *Schwartz*, 2005 WL 3148350, at *16 (*citing Amchem*, 521 U.S. at 620). In light of the numerous legal and factual issues common among Class Members here, to require Citadel investors to file hundreds or possibly even thousands of individual actions "…would constitute an egregious waste of judicial resources and private resources." *See Shaw*, 91 F. Supp. 2d at 958. Moreover, "[t]he policy at the very core of the class mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights," *Amchem*, 521 U.S. at 617, thus "it would be economically prohibitive for all but a limited number of Class Members *(i.e.,* those who had the largest losses) to adjudicate their claims individually." *Schwartz.* 2005 WL 3148350, at *16.

Finally, because Citadel's corporate headquarters and principal place of business was located in Dallas during the Class Period, this is clearly the most desirable forum in which to prosecute this action. *Id.; See also Greenwald v. Integrated Energy, Inc.*, 102 F.R.D. 65, 72 (S.D. Tex. 1984) (holding that Southern District of Texas was appropriate forum "because the headquarters of [defendant company] are located in this district as are many of the witnesses and documents"). "Many of the acts and practices complained of originated in [Dallas], and much of the evidence and many of the witnesses relevant to Lead Plaintiff's claims are found in the [Dallas] area." *Id.* Accordingly, the superiority of resolving this litigation by means of a class action is evident.

Accordingly, the Court should certify the Class for purposes of the Settlement.

## IV.     THE SETTLEMENT OF THE DERIVATIVE ACTION SHOULD BE APPROVED BY THE COURT

In approving a settlement of a shareholders' derivative action a court "must determine that there has been no fraud or collusion in arriving at the settlement agreement, and it is fair, reasonable, and adequate." *Maher v. Zapata Corp.,* 714 F.2d 436, 455 (5th Cir. 1983). Additionally, Rule 23.1, which governs settlement of derivative actions, states that a derivative action "shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Miss. 2005).

First, a combined Notice of the settlement of the Derivative Action and Class Action was sent to approximately 10,635 class members, which included, as of that date, all current record holders and/or current beneficial holders of Citadel common stock. McCabe Decl. at ¶ 4. This Notice described the nature of the pending Derivative Action, the claims asserted, and the terms of the proposed Settlement. *Id.* at ¶ 15. In addition, the Notice informed Citadel shareholders how and by what means they could obtain additional information about the Derivative Action and the Settlement; and informed them of their right to participate in the Settlement Hearing and the time and place of that hearing. *Id,; see Maher*, 714 F.2d at 451 (finding that notice of settlement of derivative action was satisfactory because it apprised shareholders of nature of action, claims asserted, general terms of settlement, where additional information could be obtained and time and place of settlement hearing).[9]

---

[9] The *Maher* Court went on to address and dismiss additional concerns made by an objector, namely that the notice at issue did not adequately address the *res judicata* effect on actions in other jurisdictions or the details of other related actions pending in other jurisdictions, by stating "[t]he notice to shareholders need not explain to them all the consequences involved in the

*(continued ... )*

Second, when determining whether a derivative settlement is fair, reasonable, and adequate, a court should consider several factors similar to those used when analyzing the fairness of a class action settlement. These factors include (1) the existence of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of plaintiffs' counsel and plaintiffs themselves. *Jackson v. Capital Bank & Trust Co.*, Case Nos. 90-4734, 90-4735, 1994 WL 118322, at *4-7 (E.D. La. March 30, 1994). As discussed in greater detail *supra*, settlement of the Derivative Action was part and parcel of the settlement of the Class Action. The analysis of the factors relevant to the fairness of the settlement of the Derivative Action are the same or substantially similar as those for the Class Action.

For example, as set forth in the McCabe Decl., the negotiation of settlement of the Derivative Action was conducted by experienced and zealous attorneys who were not only knowledgeable about the facts and legal claims, but also the strengths and weakness of their respective positions. McCabe Decl. at ¶ 68. Moreover, as previously described, Derivative Counsel conducted an extensive investigation and thereafter engaged in settlement negotiations of the Derivative Action. The negotiations took place over several weeks and was the result of numerous conversations between counsel. *Id*. at ¶¶ 36-40. Thus for the same reasons that no fraud or collusions existed in the settlement of the Class Action, no fraud or collusion existed with respect to the negotiation of the settlement of the Derivative Action. Similarly, the complexity of the litigation, the stage of

---

( *... continued*)

settlement. It is not required to provide a complete source of settlement information...and shareholders are not expected to rely on it as such." *Maher*, 714 F.2d 436.

proceedings and the likelihood of success on the merits also weigh in favor of settlement of the Derivative Action. Like the complex issues presented in the Class Action, the Derivative Action involved complicated issues of corporate fiduciary duty responsibility, abuse of control, insider selling, misappropriation of information, unjust enrichment, and violations of the Sarbanes-Oxley Act. *Id*. at ¶ 51. Like the claims brought in the Class Action, derivative claims such as these are notoriously difficult to prosecute and win. *Maher*, 714 F.2d at 455 ("Settlements of shareholder derivative actions are particularly favored because such litigation 'is notoriously difficult and unpredictable.'"); *see also Cohn*, 375 F. Supp. 2d at 852 (*citing In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 1002 (D. Minn. 2005).

With regard to the range of possible recovery, although there is no direct compensation arising out of the settlement of the Derivative Action, the Company and current shareholders still derive a substantial benefit from the Settlement because the litigation, and all its attendant expenses, distractions and disruptions, will be terminated. Furthermore, as stated above, the Derivative Action could have interfered with any acquisition of Citadel, which would be directly contrary to the Company's interests. "The avoidance of this expense, both monetarily in the form of litigation fees and expenses, and nonmonetarily in the form of disruption and distraction of management…are important and valid reasons for seeking a settlement." *Maher*, 714 F.2d at 455 (approving settlement of derivative action where the primary benefit achieved by the settlement was termination of the litigation). Moreover, since the Derivative Action is based upon the same core allegations of wrongdoing and the issuance of the same false and misleading statements as alleged in the Class Action. Since the shareholders who were harmed as a result of this fraud are being compensated by the Settlement Fund, further litigation of the Derivative Action will not create any additional benefit to the Company. Citadel itself stated, in its Form 14-A filed with the SEC on November 3, 2006,

that "[a] stockholder class action and stockholder derivative lawsuits that were filed in early 2005 also distracted management from running our business, lengthened our sales cycle and impaired our ability to complete a sale or financing transaction" Form 14-A, at 26.

Moreover, Counsel in the Derivative Action are highly experienced in derivative litigation of this nature and have determined that settlement of the Derivative Action at this time is in the best interest of the Company. McCabe Decl. at ¶¶50-52, 68. In addition, the representative plaintiff in the Derivative Action has been consulted on the Settlement and is in agreement that this Settlement is in the best interest of the Company. *Id.* at ¶52. Finally, as set forth above, there have been no objections to, or even informal inquiries about, the Settlement by any current shareholders. *Id.* at ¶53. Therefore, the overwhelming support of this Settlement by Citadel Shareholders clearly weighs in favor of the Settlement.

## **CONCLUSION**

For the foregoing reasons, Lead Plaintiff Citadel Investment Group (as to the Class Action) and Hans J. Baier (as to the Derivative Action) respectfully requests that this Court enter the proposed Final Judgment and Order Approving Settlement of the Actions, approving the proposed Plan of Allocation of the Net Settlement Fund, confirming the conditional certification of the Class for purposes of the Settlement, dismissing these Actions with prejudice and without costs, and granting any additional relief provided for in the Final Judgment and Order Approving Settlement.

Dated:  December 5, 2006

Respectfully submitted,

/s/Lawrence D. McCabe

Marvin L. Frank
Lawrence D. McCabe
**MURRAY, FRANK & SAILER LLP**
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 682-1818
Facsimile:  (212) 682-1892

- and -

Joseph M. Sternberg
Beth Hoffman
**LABATON SUCHAROW**
  **& RUDOFF LLP**
100 Park Avenue
New York, NY 10017
Telephone: (212) 907-0700

**Class Counsel**

Randall K. Pulliam
**BARON & BUDD, P.C.**
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605

**Liaison Class Counsel**

William B. Federman
**FEDERMAN & SHERWOOD**
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Telephone:     (405) 235-1560
Facsimile:     (405) 239-2112

-and-

2926 Maple Avenue, Suite 200
Dallas, TX 75201

**Derivative Counsel**

## <u>CERTIFICATE OF SERVICE</u>

On December 12, 2006, all counsel of record were served with this document on the date of filing pursuant to the Court's Standing Order Designating Case for Enrollment in the Electronic Case Files "ECF" System.

<u>/s/ Lawrence D. McCabe    </u>.